*Messrs. Potter & Nixon,* for the appellant.

*Mr. Allen B. Endicott* and *Mr. David J. Pancoast,* for the respondents.

PER CURIAM.

This decree unanimously affirmed, for the reasons given by the vice-chancellor.

---

ISAAC HUNT, appellant,

*v.*

RICHARD HUNT, respondent.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following conclusions:

This bill is filed by Isaac Hunt, to enforce the lien of a judgment against the lands of Richard Hunt, to the amount of $534.32. The judgment was recovered July 9th, 1864, not only against the said Richard, but also against the said Isaac. Isaac having paid the judgment, claims that he is entitled, by way of subrogation, to this amount as against his brother Richard. The circumstances which gave rise to the proceedings which ended in the judgment, I will briefly present.

Isaac and Richard, in 1860, were living in Missouri, and prior thereto (in 1857) Isaac took title to the undivided half of certain lands in Missouri, which will be named hereafter. In 1860, while they were engaged as partners in business in Missouri, one Emily S. Taylor, the guardian of certain infant children, who were the owners of real estate, a part of which real estate was also owned by the said Isaac as aforesaid, made application to the orphans court for an order to sell the interest in

the said lands of the said infant children. Such proceedings were had by her in the said court that an order was made directing said sale. Isaac claims that it was understood between him and Richard that Richard would buy portions of this land. He also claims that Richard and he attended the sale, and that he bought two parcels, while Richard bought three undivided one-half parcels, the other undivided half being owned by Isaac aforesaid. Richard denies attending the sale or making any bids whatsoever, or having, in the first instance, authorized his brother Isaac to make any purchase for him. He admitted that, after the sale, Isaac spoke to him about it, and asked him to go his surety upon the notes necessary to be given to perfect the sale, and that then he asked his brother Isaac to let him have a portion of the land which had been bid off to Isaac, to which, he says, Isaac consented, and that thereupon he joined with Isaac in the execution of two notes, one for the land which Isaac himself had purchased, and for which he was to have a deed, amounting to $823.84, and one for $379.64, the amount bid for the undivided half, which, it was agreed between them, should be conveyed to Richard. Upon the first of these notes, Isaac was primarily liable, and signed his name first; upon the second, Richard was primarily liable, and signed first.

Richard insists that afterwards, when he spoke to his brother Isaac respecting the deed for his lands, Isaac said to him in words, that he had taken the title to those lands in himself, and that he would deed to Richard other lands, as he had a large quantity of other lands, and that Isaac never did deliver to him the deed for these Taylor lands. It is true that Isaac procured a deed to be made to Richard for the three tracts of land which it was understood originally should be deeded to Richard. Such a deed has been produced. Isaac insists that he delivered it to Richard, but whether it was delivered or not, under the circumstances of this case, cannot be material. This case must be decided upon other grounds, of purely equitable character.

The sale was made in June, 1860. The title was perfected and the deeds therefor executed and delivered in September, 1860. On January 21st, 1861, about four months after the

execution of the deeds by Emily S. Taylor, as guardian, to Isaac Hunt and to Richard Hunt, Isaac, this complainant, executed a deed of trust in the nature of a mortgage to Wyse, Singer & Co. on two of the tracts which were included in the deed which Isaac himself had had executed by Mrs. Taylor to Richard, the one-half of which was conveyed to Richard by such deed, Isaac himself having previously become the owner of one undivided half of the said two tracts of land as aforesaid, and so held the undivided one-half portion prior to the death of the father of the said Taylor infants. It is important to observe and note that Isaac, while he in law owned only said undivided one-half of these two tracts, and had, in the September previous, accepted a deed for the other undivided one-half from Mrs. Taylor in the name of his brother Richard, he executed this deed of trust upon the whole, covering the entire fee, which also included other lands. It should also be noted that the complainant, Isaac Hunt, thus undertaking to manage this business for his brother Richard, on January 21st, 1861, the same day that he executed the said deed of trust, executed a deed to his brother Richard, purporting to convey all of his undivided one-half interest in the said three tracts, which were included in the deed that Isaac had accepted for Richard from Mrs. Taylor, in which deed, so made to Richard, he declares that it is made subject to the said trust deeds in two of the said lots.

Again, Isaac and wife executed a deed on the 30th of September, 1861, by which they conveyed the undivided one-half of the other tract, which had been conveyed to Richard by Mrs. Taylor, to Solomon Hunt. On the same day, September 30th, Richard Hunt conveyed an undivided one-half interest of the tract last named to Solomon Hunt. Solomon was the father of Richard and Isaac. Thus, it will appear that of the three tracts conveyed to Richard by Mrs. Taylor, at the time of the conveyance one-half became Richard's in law, while the other one-half was owned in fee by Isaac, and that afterwards, in January following, Isaac attempted to convey the undivided one-half which he owned in two of them to Richard, subject to the said trust deed, which really covered the entire fee of the

said two tracts, and in September following they both, by separate deeds, conveyed an undivided one-half to their father in the third tract.

Now, it must be borne in mind, that, when Isaac conveyed the said two parcels to Richard, which parcels were covered by the said trust mortgage, he also conveyed to him the undivided one-half of the said third parcel, so that, being in January, 1861, if Isaac understood that Richard had title already to an undivided one-half, by virtue of the deed which had been executed to Richard by Mrs. Taylor, then Richard had the entire fee, having one undivided half from Mrs. Taylor, and the other undivided one-half from his brother Isaac, and, of course, nothing remained for Isaac to convey to his father, Solomon, in September following (1861). But, notwithstanding this important fact, Isaac conveyed the undivided one-half, as I have stated, of this third tract to his father, September 30th, 1861, and at the same time Richard conveyed an undivided one-half part of the same to his father. This fact greatly increases the probabilities of Isaac's story above referred to—that is, to the effect that when he spoke to Richard about the lands which Richard was to have conveyed to him by Mrs. Taylor, Isaac said that that made no difference, he had taken them himself, and, as he had a great deal of other land, he would convey other land to Richard.

Then it would seem beyond controversy that, although Isaac did procure a deed to be made by Mrs. Taylor to his brother Richard, for the undivided half of said three tracts, and although that deed may have been formally delivered to Richard, yet, nevertheless, Richard never received any benefit whatever from such transaction, but that, on the contrary, Isaac appropriated the entire undivided one-half of said lands so purchased to his own use, and had and enjoyed all the benefits that ever have been derived therefrom. The testimony seems to establish these facts beyond controversy. Even the statement of the complainant alone raises the most serious doubt as to his right to any relief in this court.

Much reliance has been placed upon the testimony of Isaac's wife. What she speaks about took place in 1860, fully twenty-

-five years before she was sworn. Her statements are to the
-effect that Richard either spoke to her, or in her presence, about
his intention to attend the sale of these lands, and to buy; and
that the next day after the sale, upon his return, she inquired of
him about it, and that he gave her to understand that he had
purchased. This all may have taken place, and is perfectly con-
sistent with what Richard himself says. There can be no doubt
from Richard's statement, that he expected to have a deed for a
portion of these lands, and, with that purpose in view, did exe-
-cute these notes with his brother; and that the apparent dis-
-crepancy in the testimony disappears when it is considered that
it was after these transactions, after the execution of the notes
-and of the deeds themselves, when Richard says that he
inquired of his brother about these lands, and his brother told
him that he kept them himself, and would deed to him portions
-of his other lands.

Another point is pressed as of great importance, and that is,
that in the year 1866 Richard executed a deed of release, releas-
ing all his interest to one of the subsequent purchasers of this
tract (which I have spoken of as the third tract), which, it is
·claimed, was a recognition, upon his part, of his title thereto.
No such effect is produced on my mind by the facts, as I have
detailed them. See what they are: At first, Richard supposed
he had his undivided one-half; afterwards Isaac told him that
he had taken title himself; that he would convey to Richard
·other lands; and then, in January, 1861, Isaac conveyed to
Richard an undivided one-half interest in this tract, which I
have spoken of as the third tract, leaving, as would appear to
Richard, the other undivided one-half still in Richard, Richard
having taken title to one-half from Mrs. Taylor, and having
·owned the other undivided one-half previously; and in Septem-
ber, 1861, following, Isaac conveyed the one-half, which Richard
:supposed still remained in Isaac, to his father, Solomon, and on
the same day Richard also conveyed the undivided one-half
which Isaac had conveyed to him to his father, Solomon. To
Richard's mind, as I understand the facts, this would be most
plain and consistent; but afterwards one Green became possessed

Hunt *v.* Hunt.

of the title, and it was very natural, certainly to the legal mind,. that he should discover what appears upon the records of the court respecting the title to this property, which was that Mrs.. Taylor, as guardian, had been ordered to execute and deliver a. deed for the undivided one-half of these three parcels of land to the said Richard, which included this third tract, to which Richard executed said release to Green. · Now, that Green, discovering this fact upon the record, should desire to remove the cloud which was thereby presented from the title is most reasonable and proper.

It will be more satisfactory to those who desire a better understanding of this case than appears from the facts already presented, to know that Isaac and Richard left the State of Missouri in the year 1861, soon after the commencement of hostilities between the North and South, and that all of Richard's. effects, such as they were, few in number, except what he carried upon his person, were left in Isaac's house in Missouri, and were,. with other things, put in a trunk or box, and shipped to New Jersey by Isaac or some member of his family, and that in this. trunk, with these other things, the deed made by Mrs. Taylor to Richard was discovered, after the commencement of these proceedings, in the year 1885.   This deed had not been recorded up to that time, but I believe has been since.

I think the bill should be dismissed, with costs.

*Mr. William M. Lanning,* for the appellant.

*Mr. W. D. Holt,* for the respondent.

Per Curiam.
This decree reversed.

*For affirmance*—Dixon—1.

*For reversal*—The Chief-Justice, Depue, Garrison,. Knapp, Magie, Reed, Scudder, Van Syckel, Brown,. Clement, Cole, Whitaker—12.